IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

TERRY LAMAR BAKER,                         :
                                           :
    Plaintiff,                             :
                                           :
VS.                                        :        CIVIL ACTION FILE NO.
                                           :         **1: 04-CV-49 (WLS)**
STEPHEN UPTON, Warden, et al.,             :
                                           :
    Defendants.                            :
_____

### RECOMMENDATION

Presently pending in this *pro se* prisoner 42 U.S.C. § 1983 action is defendants' motion for

summary judgment. (Tab 23).   Plaintiff alleges that he is entitled to compensatory and punitive

damages for alleged ineffective medical treatment he received while at Calhoun State Prison for

staph skin infection resulting in permanent damage to the skin on his neck and back.  Defendants

are all officials at Calhoun State Prison.

    In determining a summary judgment motion, the inferences drawn from the underlying

facts must be viewed in the light most favorable to the nonmoving party.  Welch v. Celotex

Corp., 951 F.2d 1235 (11th Cir. 1992)(citing Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio

Corp., 475 U.S. 574 (1986).  However, once the movant demonstrates the absence of a genuine

issue of material fact, the nonmovant must "make a showing sufficient to establish the existence

of an element essential to the party's case, and on which that party will bear the burden of proof

at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

When the nonmoving party has the burden of proof at trial, the moving party may carry its

burden at summary judgment either by presenting evidence negating an essential element of the

nonmoving party's claim, or by pointing to specific portions of the record which demonstrate

that the nonmoving party cannot meet its burden of proof at trial.  Clark v. Coats & Clark, Inc.,

929 F.2d 604, 606-608 (11th Cir. 1991).

The existence of material disputed facts will not defeat summary judgment in favor of a

public official, however, when the plaintiff "fails to make a showing sufficient to establish the

existence of an element essential to [plaintiff's] case, and on which [plaintiff] will bear the

burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91

L.Ed.2d 265 (1986).  Facts in dispute cease to be "material" facts when the plaintiff fails to

establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material

fact,' since a complete failure of proof concerning an essential element of the nonmoving party's

case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322-23, 106 S.Ct. at

2552. Thus, under such circumstances, the public official is entitled to judgment as a matter of

law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the

dismissal of factually unsupported claims prior to trial.

Plaintiff entered the Georgia Prison system on September 18, 2001,  and in his initial

psychiatric evaluation at Georgia Diagnostic and Classification Prison on October 2, 2001, he

admitted to a three-year history of a back infection which he "picked at" that "resulted in four or

five skin grafts over the years with yet one more ulcer still active on the upper part of his back."

Plaintiff admitted to "four or five" mental health hospitalizations as well as taking Klonopin

(anti-seizure medication) with Percocet (a narcotic analgesic) for the preceding three years.

Plaintiff's diagnosis was panic disorder with agoraphobia; he was placed on the mental health

caseload; his medications were listed as Risperdal (an antipsychotic), Klonopin (anti-seizure),

Atarax (anti-anxiety), Prozac (antidepressant), Keflex (anti-bacterial), Neurontin (anti-seizure),

and Tylenol #3. (Ayers Aff. Att. pp. 255-57; Certified Movement History, Exh. B.)

Plaintiff continued to receive treatment for his self-inflicted skin lesion (which plaintiff continued to aggravate) at various correctional institutions.  Plaintiff received various medications, including Toradol, a non-steroidal anti-inflammatory drug (NSAID) to reduce pain, Kenalog ointment (a steroidal cream), Silvadene (a topical anti-infective), Keflex, (an anti-bacterial), and Vitamin A and Vitamin D ointment, to apply to his scar to reduce inflammation, and Darvocet, Tylox, and Paxil.  (Ayers Aff. ¶¶ 5-7.)  Factitious dermatitis is a self-inflicted cutaneous injury, ordinarily associated with emotional stresses ranging from simple anxiety to severe personality disorders. Patients with factitious dermatitis produce and perpetuate skin lesions which are not easily diagnosed. Neurotic excoriation refers to a patient's uncontrollable urge to pick and dig at the skin. The urge may be unconscious or deliberate. It is not uncommon for patients with factitious dermatitis and neurotic excoriation to experience delusions of parasitosis, which is the delusion of an infestation of parasites under the skin, even bringing in tissue that they have dug out of their skin, convinced that upon examination, it will reveal the parasites living in the skin. (Ayers Aff. ¶ 14.)

Plaintiff was transferred to Calhoun State Prison on August 26, 2003. His prescriptions were listed as: Bactrim, Cipro, Tylenol #3, Zantac, Risperdal, Klonopin, and Paxil, and these were renewed the same day. Plaintiff was seen by nurses in the Medical Clinic repeatedly for dressing changes (August 26, 27, September 1, 2, 3, 4, 2003). On August 29, 2003, he was examined by Larry Edwards, Physician Assistant, who advised Plaintiff that because Tylenol #3 was habit-forming, it could not be used on an ongoing basis for a chronic condition. On September 2, 2003, Dr. Dwayne Ayers, Medical Director of Calhoun, reviewed the report of the examination

conducted by Mr. Edwards.

Plaintiff was enrolled in Medical CIC for GI and Dermatology. In his Mental Health

Psychiatric Evaluation on September 3, 2003, it was noted that plaintiff "denies any

responsibility of medical problems." (Ayers Aff. ¶ 22; Ayers Aff. Att. p. 262.)  On September 5,

2003, plaintiff was examined by Dr. Ayers, who observed "good granulation tissue and only

minimal drainage" in plaintiff's neck and shoulder. Dr. Ayers advised that the wound care

plaintiff had been consistently receiving at the Medical Clinic be continued. On September 8,

2003, Plaintiff's Risperdal, Paxil, and Klonopin were renewed. On September 12, 2003, Dr.

Ayers observed that plaintiff's wound appeared "to be enlarging with serious drainage

increased." Plaintiff was prescribed Bactrim (antibiotic), Feldene (non-steroidal anti-

inflammatory), and Percogesic for pain. (Ayers Aff. ¶ 23.)

On September 24, 2003, Dr. Ayers examined plaintiff at Calhoun CIC; and recorded his

medications as including: Bactrim, Feldene, Percogesic, Risperdal, Paxil, and Zantac. Dr. Ayers

noted therapeutic measures for the large fresh excoriations on Plaintiff's neck wound as

including Benedryl and triple antibiotic ointment to replace Silvadene. Plaintiff's dressing

changes were ordered to be conducted twice daily at pill call at 5:30 a.m. and 4:30 p.m. (Ayers

Aff. ¶ 24.)  On October 15, 2003, Dr. Ayers discussed Plaintiff's condition with Dr.

Aton in Dermatology at ASMP via telemed; Dr. Aton expressed concern that longterm

metaplastic changes in the cell structure could have developed into squamous cell carcinoma (a

form of skin cancer more commonly encountered as the result of sun damage). To rule out such a

possibility, Dr. Ayers submitted a consult request for a skin biopsy pursuant to Dr. Aton's

recommendation. On October 16, 2003, Utilization Management (UM) approved the biopsy. The

results of the biopsy were: "No significant atypia and no tumor are identified." On October 28,

2003, Dr. Ayers requested a follow-up consultation with Dr. Aton for plaintiff, which

was approved for telemed on October 29, 2003. (Ayers Aff. ¶ 25.)  Through November and

December, plaintiff's medication regimen was continued at Calhoun. On November 12, 2003,

plaintiff's Percogesic was renewed; on November 23, 2003, his Paxil was renewed and Risperdal

was increased; on December 3, 2003, Silvadene ointment and Benedryl were prescribed, and his

Darvocet was increased; on December 5, 2003, his Percogesic was discontinued.

However, on December 15, 2003, Dr. Ayers noted during a CIC follow-up to a telemed

consultation with Dr. Aton that Plaintiff was "not very compliant with meds." Plaintiff was

prescribed Prednisone (pursuant to Dr. Aton's recommendation), Kenalog (a topical steroid), and

Percogesic for pain; his Silvadene was discontinued. (Ayers Aff. ¶¶ 26-27.) On December 10,

2003, Dr. Aton reported via telemed of his evaluation of plaintiff: "The patient has a large area

of granulation tissue now on the upper back and neck. A biopsy performed from this area 2

months ago showed that there was no evidence of neoplastic change." Dr. Ayers submitted a

consult request for plaintiff to be seen by Dr. Aton for a follow-up dermatology appointment

when plaintiff was at ASMP for his knee surgery (a total knee replacement not at issue in

this lawsuit). That consult request was approved by UM on December 16, 2003.
(Ayers Aff. ¶ 27.)

On January 12, 2004, Dr. Ayers examined plaintiff for enlargement of his cervical (neck)

lymph glands (adenopathy), a condition frequently associated with bacterial infection. Lymph

nodes adjacent to an infected skin area are vulnerable to infection spread from that area. Dr.

Ayers educated plaintiff on the relationship between adenopathy and medication compliance,

which reduces the risk of infection; Dr. Ayers also renewed his Bactrim. On February 11, 2004, plaintiff's Paxil and Risperdal were renewed. On February 26, 2004, his Triamcinolone ointment was renewed, and on March 1, 2004, his Feldene, Percogesic, Benedryl, and Darvocet were renewed. (Ayers Aff. ¶ 28.)

Plaintiff received continuing mental health counseling while at Calhoun, as noted in the Mental Health Quarterly Utilization Reviews conducted on January 30 and March 1, 2004. (Ayers Aff. Att. p. 265.)

On March 31, 2004, Dr. Aton at ASMP again examined plaintiff, and observed: "large area of granulation tissue and ulceration of the upper back and neck is healing well." He recommended follow-up in six months. Dr. Ayers submitted a consult request for a six-month follow-up, which was approved on the same day. Dr. Ayers also ordered dressing changes for plaintiff pursuant to Dr. Aton's recommendations. (Ayers Aff. ¶ 29.)

Through May, June and July, 2004, Plaintiff's medication regimen was continued at Calhoun. On May 25, 2004 and on July 20, 2004, Plaintiff's Paxil and Risperdal were renewed; on May 28, 2004, his Feldene and Benedryl were renewed; on June 3, 2004, his Triamcinolone ointment was renewed, and on June 4 his Percogesic was renewed. On July 10, 2004, plaintiff's Percogesic was replaced with Darvocet. On June 18, 2004, plaintiff was prescribed Amoxicilin, an antibiotic for his staph infection, and on July 10, 2004, he was prescribed Keflex(an antibiotic). On July 26, 2004, his Kenalog (topical steroid) ointment was renewed. (Ayers Aff. ¶¶ 30-32.)

On July 26, 2004, Dr. Ayers submitted a consult request for specialized wound care evaluation and management for Plaintiff to supplement his mental health and dermatology

treatment. The consult request listed plaintiff's current medications as: "Kenolog ointment,

Benadryl, Motrin, Percogesic, Risperdal, and Paxil." That request was approved by UM on July

30, 2004. Plaintiff was examined by Dr. Buntin at Phoebe Wound Care Center on August 3,

2004.  Plaintiff received a porcine collagen graft with an Adaptic dressing and wound care

instructions. (Ayers Aff. ¶ 32.)  On August 4 and 11, 2004, plaintiff met with Dr. Ayers to

discuss the consult and review the plan of care. Plaintiff was prescribed Vitamin C, an

antioxidant required for tissue growth and repair. On August 9, 2004, Dr. Ayers submitted a

consult request for the one-week follow-up visit requested by Phoebe Wound Care Center; this

request was approved by UM on August 20, 2004. On August 10, 2004, laboratory results

revealed moderate growth of staphylococcus aureus. On August 11, 2004, according to Dr.

Buntin's consult report, a culture was taken from Plaintiff's neck and submitted for analysis; the

laboratory report shows that "scant growth of staphylococcus aureus and streptococcus

equisimilis"was detected. (Ayers Aff. ¶ 32.)

On August 23, 2004, Plaintiff's wound was debrided (dead tissue removed) at Phoebe Wound

Care Clinic, his ointment was changed to Iodosorb (antimicrobial) ointment, and he was advised

to leave the dressing on for four days at a time. Darvocet was recommended to be continued for

pain. On August 27, 2004, Dr. Ayers submitted a consult request for Plaintiff for a one-week

follow-up with Phoebe Wound Care Clinic; UM approved that request on August 30, 2004,

(documented on September 2, 2004). At that follow-up appointment on September 1, 2004

(documented on September 3, 2004), it was noted that "Patient's largest wound has decreased

significantly with present treatment. Discussed with Dr. J. Freeman and he concurs in continuing

present treatment. Debrided wound with some discomfort to patient. Will use Hydrofera Blue

(bacteriostatic dressing) on wound." (Ayers Aff. ¶ 33.)

On September 8, 2004, Dr. Ayers submitted a consult request for a weekly follow-up at

Phoebe Wound Care Center; Plaintiff was seen for a follow-up visit at there on September 9,

2004. On September 14, 2004, Dr. Ayers submitted a consult request for Plaintiff for a weekly

follow-up at Phoebe Wound Care Center.  On September 20, 2004, according to Dr. Buntin's

consult report: "Two of the smaller wounds are gone – the largest wound shows evidence of

healing with granulation . . . [Dr. Buntin] shaved the posterior portion of his hair on the nape of

the neck. Then [he] debrided the wound. On the right shoulder is a small area of blisters which

we will cover with Silvadene. Hydrofera Blue goes on large wound. Will see patient in a week.

Suggest Silvadene to entire wound if Hydrofera Blue does not stay in place." Dr. Ayers

prescribed Darvocet and Silvadene for plaintiff the same day and placed an order for his head to

be shaved two times a week due to the neck wound. Also on September 20, 2004, Dr. Ayers

submitted a consult request for a weekly follow-up at Phoebe Wound Care Center; plaintiff was

seen for a follow-up visit there on September 27, 2004. (Ayers Aff. ¶ 34.)

Through August and September, 2004, Plaintiff's medication regimen was continued at

Calhoun. On August 2, and September 1, 2004, his Darvocet was renewed. On August 30, 2004,

his Benadryl and Feldene were renewed. Plaintiff's prescription for Percogesic was discontinued

and replaced with 800 mg. of Ibuprofen. In addition to receiving continuous medications,

Plaintiff received medical profiles as reflected in his Health/Activity Profile dated September 22,

2004, including physical capability, lower extremities, hearing, vision, psychiatric grade, dental

grade, and work capacity. The profiles provided plaintiff with special housing, a cane,

enrollment in CIC, mental health treatment, and listed his conditions as including a chronic neck

wound and degenerative joint disease of his left knee. (Ayers Aff. ¶¶ 32, 34, 35.)

On September 27, 2004, Dr. Ayers submitted a consult request for plaintiff for a weekly follow-up at Phoebe Wound Care Center and included his physical findings: "Neck-good granulation tissue noted; slight decrease in size of wound area noted; no sign of active infection noted." At that follow-up visit on October 6, 2004, it was noted, "Evaluated wound area, had Dr. James Freeman consult. We feel that new tissue is now growing . . . We will hold on skin graft for now as patient's skin 'islands' are throughout the wound." Dr. Buntin recommended continued use of Polymem Silver wound dressing, changed once a week. (Ayers Aff. ¶ 36.)

On October 8, 2004, Dr. Ayers submitted a consult request for plaintiff for a weekly follow-up at Phoebe Wound Care Center, and Plaintiff was seen there on October 18, 2004, where it was noted that "He is also by his own admission continually scratching the area and re-inoculating wound. We will use Accuzyme (topical enzymatic), a debriding agent for now." On the same day, Dr. Ayers prescribed Accuzyme spray and ordered wound care to incorporate its use, renewing this order on November 17, 2004. On October 26, 2004, plaintiff was again seen by Dr. Buntin at Phoebe Wound Care, who concluded, "Treatment completed. Indicates some continued progression of healing, but eventually may require grafting." (Ayers Aff. ¶ 37.)

Through October, November and December, 2004, Plaintiff's medication regimen was continued at Calhoun. On October 1, 2004, his Toradol was renewed. On October 4, 2004, Dr. Ayers again ordered Vitamin C to promote wound healing. Plaintiff's Percogesic and Feldene were renewed, and his Motrin was reduced. On October 22, 2004, plaintiff's Paxil, Risperdal, and Benadryl were renewed; however, his Benadryl was discontinued on October 27, 2004. On November 15, 2004, plaintiff was prescribed Celebrex (NSAID-related); his Feldene (NSAID)

and Motrin (NSAID) were discontinued because they would be duplicative of Celebrex. His

Percogesic was also discontinued to determine whether the Celebrex would be sufficient to

reduce the pain. Plaintiff's Vitamin C was renewed on November 29, 2004; his Percogesic was

renewed for additional pain management on December 7, 2004; and his Benadryl was renewed

on December 29, 2004. On December 7, 2004, Dr. Ayers observed that no new medications or

labwork was necessary for plaintiff, because there was a lack of significant shoulder pathology.

(Ayers Aff. ¶¶ 36-37.)

On December 6, 2004, the Intervention Strategies for Plaintiff's mental health problems

included: "(1) inmate will meet with mental health counselor once a month for supportive

counseling and relaxation techniques; (2) inmate will meet with psychiatrist every 30-90 days for

medical evaluation and education; and (3) inmate to attend appropriate groups when offered."

(Ayers Aff. Att. p. 267.)

Plaintiff reported to his mental health counselor at Calhoun on April 22, 2005,  an increase in

his compliance with his medical treatment and a reduction in his picking at the lesions in his

neck. The mental health counselor observed that plaintiff looked better groomed and that "the

lesion on his neck appears to be healing." On April 26, 2004, plaintiff met with his treating

psychiatrist at Calhoun, Dr. Virginia Wright, who reported that plaintiff "says he is doing better,

wound healed." (Ayers Aff. Att. pp. 269-270.)

Plaintiff transferred to Johnson State Prison on June 7, 2005. His Mental Health Transfer

Summary states that the "Progress Made in Treatment at Current Institution" includes:

"reduction in anxiety, less somatic complaints, overall improvement." (Ayers Aff. Att. p. 272;

Exh. B, Movement History.)

It is well established that prison personnel may not subject inmates to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97 (1976).   However, "[m]ere incidents of negligence or malpractice do not rise to the level of constitutional violations." Harris, 941 F.2d at 1505.   It must involve the "unnecessary and wanton infliction of pain contrary to contemporary standards of decency." Helling v. McKinney, 509 U.S. 25 (1993).     Knowledge of the medical need alleged or circumstances clearly indicating the existence of such need is essential to a finding of deliberate indifference.   Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1191 (11th Cir. 1994), quoting  Horn ex rel. Parks v. Madison Co. Fiscal Court, 22 F.3d 653, 660 (6th Cir. 1994), cert. denied, 513 U.S. 873 (1994).   In the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.   "It is......true that when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation."   McElligott v. Foley, 182 F.3d 1248, 1256-1257 (11th Cir. 1999).

A medical need is considered "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir.1994) (quotation marks and citation omitted).

The record in this case is replete with continuing medical and psychiatric treatment for

11

plaintiff's chronic, self-inflicted condition.  It is significant that officials at Calhoun State Prison consulted outside experts in treating plaintiff's medical condition, including specialists at Augusta State Medical Prison and at Phoebe Wound Care Center.  Plaintiff's medication has been continuously monitored and adjusted as necessary, his wounds and dressing have been changed as needed.  Plaintiff continued to receive mental health care, including prescribed drugs such as Paxil.  It would be difficult to determine what more these officials could have done in light of the extensive efforts of these officials.

  Just because a plaintiff disagrees with the medical decision does not evidence deliberate indifference to his serious medical needs. This case presents a classic example of a plaintiff's disagreement with the medical judgment  used in plaintiff's treatment, sounding in medical malpractice.   To demonstrate "significant" harm, a plaintiff must provide verifying medical evidence that proves that it was the denial or delay in medical treatment that caused the harm rather than an underlying condition or injury.   Hill, 40 F.3d at 1186;   Harris,  21 F.3d at 393-94 (11th Cir.1994).   Nothing plaintiff has provided the court, nor anything revealed by a review of the record, rebuts defendants' properly supported motion for summary judgment.

   Consequently, it is the RECOMMENDATION of the undersigned that defendant's motion for summary judgment be **GRANTED**.  Pursuant to 28 U.S.C. § 636(b)(1), the parties may file written objections to this recommendation with the Honorable W. Louis Sands, United States District Judge, WITHIN TEN (10) DAYS of receipt thereof.

**SO RECOMMENDED**, this 16th day of February, 2005.


//S Richard L. Hodge
RICHARD L. HODGE
UNITED STATES MAGISTRATE JUDGE

msd